(CLOSED)

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| STACEY VERELLI, individually, and TYRELL VERELLI, an infant by his Guardian Ad Litem, STACEY VERELLI, | : : : : : : |
| Plaintiffs, | : : |
| v. | **OPINION** : : Civil Action No: 02-1683 (JCL) |
| THE CITY OF GARFIELD, GARFIELD POLICE DEPARTMENT, GARFIELD HOUSING AUTHORITY, THE BERGEN COUNTY PROSECUTOR'S OFFICE, JOHN/JANE DOE 1-10 (fictitious), ABC and XYZ Corporations (fictitious), | : : : : : : : |
| Defendants. | : : : |

**LIFLAND, District Judge**

Defendants City of Garfield ("the City"), the Garfield Police Department ("Garfield Police"), and the Bergen County Prosecutor's Office ("BCPO") move for summary judgment on Plaintiff Stacey Verelli's[1] claims alleging civil rights

---

[1] On January 24, 2006, a suggestion of death was filed on the record for Stacey Verelli pursuant to Federal Rule of Civil Procedure 25(a)(2).

violations arising from a January 25, 2001 police search of her home.[2]  For the reasons below, Defendants' motions will be granted.

## I.  Background

In 1996, Verelli began dating a man named Jerry Shanks.  The two lived together for a short period at Verelli's grandmother's home, until later that year when Shanks was convicted and incarcerated for selling narcotics.  By 1999, Shanks was released from prison, and he and Verelli resumed their relationship.  By then, Verelli had moved into an apartment in the Garfield Housing Authority ("GHA") complex in Garfield, New Jersey, and Shanks would spend at least two to three nights per week there with her.

During this period, Shanks resumed selling illegal narcotics.  On November 2, and November 15, 2000, Shanks sold crack cocaine to BCPO undercover Detective Kristen P. Mecionis[3] at a location within 500 feet of the GHA complex.  Detective Mecionis arranged to buy crack cocaine from Shanks again on January 25, 2001 on a street adjacent to the GHA complex.  During their conversation, Shanks told Detective Mecionis to meet him at 7:00 p.m., and that before their

---

[2] All claims against Defendant Garfield Housing Authority were dismissed with prejudice by Order dated September 11, 2003.

[3] Detective Mecionis's surname was Paxos at the time of the events of this case.  To be consistent, the Court will use her current surname.

meeting, he had to go to his apartment to "pick it up."  (Affidavit of Kristen P. Mecionis ("Mecionis Aff.") ¶ 3.)  Mecionis interpreted "it" to mean the crack cocaine that Shanks agreed to sell to her.  (Id.)

Verelli testified that Shanks entered her apartment that evening about 15 minutes prior to when the police arrived at her door.  Shanks went upstairs, and then quickly left the apartment.  The BCPO officers monitoring the situation observed Shanks leave Verelli's apartment, and drive to the pre-arranged meeting place where he sold crack cocaine to Detective Mecionis.  After receiving a signal from Detective Mecionis, the BCPO officers surrounded Shanks's vehicle in order to arrest him.  Shanks exited the car and fled on foot towards the GHA complex, screaming the name "'Stacey' at the top of his lungs."  (Affidavit of Anthony Martino ("Martino Aff.") ¶ 3.)  BCPO Detective Anthony Martino chased Shanks into the GHA complex, and arrested him before he could reach the front door of Verelli's apartment.  (Id.)

Suspecting that Shanks kept drugs inside Verelli's apartment, and that Shanks's screams were intended to warn Verelli to destroy the drugs, the BCPO officers decided to conduct a search.  At the time, Verelli was home with her two children, and with a neighbor, Roseanne DeFranco.  The officers on the scene knocked on Verelli's door.  When Verelli heard the knock she was cooking dinner,

so she asked DeFranco if she could open the door. "[W]hen [DeFranco] opened the door," Verelli testified, "to me it seemed about eight or nine people just walked into my house." (Verelli Dep. 56:21-24.)

Standing in Verelli's kitchen, the officers identified themselves as members of the Bergen County Narcotics Task Force, and were dressed in plain clothes with their guns and badges visible. A police officer from the Garfield Police, who was wearing a uniform, accompanied the BCPO officers. BCPO Detective Richie Barbato then informed Verelli that Shanks was arrested for selling drugs, and that because they believed Shanks was keeping drugs there, they wanted to search her apartment. Verelli asked Detective Barbato whether he had a search warrant, or whether she was under arrest. Detective Barbato answered no to both questions. Verelli then replied, "[w]ith all due respect, if I'm not under arrest and if you don't have a search warrant, then you have to get the hell out of my house." (Verelli Dep. 83:21-24.) The officers refused to leave (Verelli Dep. 83:25-13), and Verelli claims that Detective Barbato responded:

> We can do this one of two ways. . . . We can notify DYFS (the Department of Youth and Family Services) and we can have your children taken away from you if you don't sit down and willingly sign the consent form, or you can wait here while we go to a judge and a get a search warrant.

(Verelli Dep. 79:14-22, 82:9-23.). After Detective Barbato allegedly made these

4

statements, Verelli claims that she attempted to call her attorney, but one of the officers removed the phone from her hand and hung it up, and told Verelli that she "wasn't calling anybody." (Verelli Dep. 84:15-24.)

Detective Barbato then spoke with Verelli for about a half-hour, in order to convince her to consent to a search of her apartment. Eventually, Verelli told Detective Barbato that she would consent if she could have Billy Ray Kelly, a representative from a local chapter of the National Association for the Advancement of Colored People ("NAACP"), present during the search to ensure that the officers did not plant any evidence in the apartment. The officers agreed, and once Kelly arrived, permitted him and Verelli to speak privately in the living room. Kelly advised Verelli to cooperate and allow the search, and said he would be there to observe and ensure that the officers did not plant evidence in her home. Verelli then read and signed a consent form given to her by the BCPO officers. She testified that she understood the form, and unequivocally agreed to its terms. From the time the officers arrived, to the time Verelli signed the consent form, approximately 45 minutes to one hour had passed. (Verelli Dep. 109:20-110:3.) While Verelli said she felt "safe" with Kelly present, she thought she "really didn't have any choice but to sign the form," because otherwise the officers "weren't going to leave my house." (Verelli Dep. 95:3-16.)

Eight to ten officers then searched Verelli's apartment for approximately 45 minutes to one hour in the presence of Kelly, Verelli, her grandmother, and youngest child. The officers did not find any drugs in the apartment during their search. Kelly testified that he had no concerns about the way in which the police conducted the search, and that they were polite and explained everything they were doing. (Mecionis Aff., Ex. E, pp. 4-5.) After the search was complete, the officers left Verelli's apartment.

On April 12, 2002, Verelli filed a complaint claiming that the search violated several of her civil rights. The City of Garfield, Garfield Police Department, and the BCPO now move for summary judgment.

## II.     **Standard of Review**

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56; Serbin v. Bora Corp., 96 F.3d 66, 69 n.2 (3d Cir. 1996). In evaluating a summary judgment motion, a court must "draw all reasonable inferences in favor of the non-moving party." Armour v. County of Beaver, PA, 271 F.3d 417 (3d Cir. 2001) (internal quotations omitted). The burden of showing that no genuine issue of material fact exists rests initially on the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Huang v. BP Amoco Corp.,

271 F.3d 560, 564 (3d Cir. 2001). Once the moving party has made a properly supported motion for summary judgment, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 242.

The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991) (noting that a motion for summary judgment is not defeated by mere allegations, general denials, or other "vague statements"). Rather, only disputes regarding facts that might affect the outcome of the lawsuit under the governing law will preclude the entry of summary judgment. Anderson, 477 U.S. at 247-48. If the evidence is "such that a reasonable jury could return a verdict for the nonmoving party," summary judgment should not be granted. Id. at 248; Lawrence v. Nat'l Westminster Bank of New Jersey, 98 F.3d 61, 65 (3d Cir. 1996).

## III.   Discussion

### A.   Verelli's Claims

Verelli's Complaint alleges numerous common law, statutory, and constitutional violations, based on both federal and state law, and seeks, inter alia,

100 million dollars in compensatory damages.[4]  Verelli candidly admitted during her deposition that the only way in which she now claims that the Defendants violated her rights is that "[t]hey wouldn't leave [her] house when [she] asked them to."  (Verelli Dep. 179:25-181:3.)  Defendants' motions for summary judgment treat this admission as an abandonment of all claims, save for a claim that her home was searched without a warrant in violation of the Fourth Amendment.  (See BCPO's Br. Supp't Mot. Summ. J. p. 10; City of Garfield and Garfield Police's Br. Supp't Mot. p. 11.)  Verelli's response does not dispute Defendants' characterization, and indeed, defends the summary judgment motions only on the merits of her Fourth Amendment claim.  Thus, the Court will treat all other claims as abandoned by Plaintiffs, and will proceed to examine Verelli's Fourth Amendment claim.

### B.     Fourth Amendment Claim

The Fourth Amendment of the United States Constitution requires that all searches and seizures be reasonable.  "Warrantless searches and seizures inside

---

[4] As best as the Court can tell, Verelli's Complaint asserts, among others, federal claims under 42 U.S.C. §§ 1981, 1982, 1983, 1855(3), 1986, and 1988(3) asserting violations of the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution; and state claims alleging false arrest, failure to train or supervise, assault, defamation, negligence, violation of the New Jersey Tort Claims Act, and the New Jersey Constitution, Article I, sections 1, 7, 10, 11, and 12.

someone's home . . . are presumptively unreasonable unless the occupants consent or probable cause and exigent circumstances exist to justify the intrusion." United States v. Coles, 437 F.3d 361, 365-66 (3d Cir. 2006).  Here, the search did not violate the Fourth Amendment because probable cause and exigent circumstances existed.

### i.      Probable Cause and Exigent Circumstances

"When government agents . . . have probable cause to believe contraband is present and, in addition, based on the surrounding circumstances or the information at hand, they reasonably conclude that the evidence will be destroyed or removed before they can secure a search warrant, a warrantless search is justified."  United States v. Rubin, 474 F.2d 262, 268 (3d Cir. 1973); see Coles, 437 F.3d at 366 ("[E]xigent circumstances include . . . the possibility evidence may be removed or destroyed.") (citing Rubin, 474 F.2d at 268); United States v. Velasquez, 626 F.2d 314, 317 (3d Cir. 1980) (exigent circumstances exist "where there is a risk of destruction of evidence") (citing Rubin, 474 F.2d at 268).

In Rubin, federal customs agents observed the defendant deliver a large amount of hashish to a man in the garage of a home in Philadelphia.  474 F.2d at 264, 269.  Soon thereafter, the defendant left the home without the drugs, and drove away.  Id. at 264.  When agents attempted to pull his car over about six

blocks from the home, the defendant intentionally pulled into a gas station, "where it appeared to the agents he was known to some of the persons present." Id. at 264, 269.  Upon arrest, the defendant yelled out, "Call my brother." Id.  The agents then decided to search the home without a warrant before the drugs could be removed or destroyed.  Id. at 264, 269.

On these facts, the United States Court of Appeals for the Third Circuit held, first, that the agents had probable cause to believe that drugs were inside the home.  The agents observed the defendant deliver a package they knew to contain drugs to the home, and upon his arrest shortly after leaving the home, hashish was found on the defendant's clothes.  Id. at 269.  Second, the Court held that the agents had a reasonable belief that the drugs at the home would be destroyed if they waited to secure a warrant before searching, and thus, exigent circumstances existed.  Id.  The agents knew at least one person was in the home with the drugs. Id.  In light of the defendant's yelling at the gas station, which appeared to be in the presence of people he knew,

> [i]t was not unreasonable for agents to believe that this might well be a signal to alert persons [at the home with the drugs] of [the defendant's] arrest and of imminent police intervention into their activities, even though the agents did not see a telephone call made and had no knowledge of the existence of any brother of [the defendant].

10

Id.

The Court of Appeals explained that these facts distinguished Rubin from the United States Supreme Court's decision in Vale v. Louisiana, 399 U.S. 30 (1970). Rubin, 474 F.2d at 267. In Vale, officers arrested the defendant on the front porch of his home after observing him engage in a drug transaction in the street. 399 U.S. at 32. The officers then searched his home without a warrant. Id. at 33. The Supreme Court said that this warrantless search was not justifiable in order to prevent the destruction of evidence, "since by their own account the arresting officers satisfied themselves that no one else was in the house when they first entered the premises." Id. at 34. As the Third Circuit explained, therefore, "[t]he facts [in Vale] did not support a belief by the arresting officers that there was even a 'threatened' destruction or removal of the narcotics" in the defendant's home, and as a result, no exigent circumstances existed. Rubin, 474 F.2d at 267. In contrast, in Rubin, the officers were aware that at least one person was present in the home searched, and reasonably believed that the defendant made an attempt to communicate the presence of police to this person. "[I]n light of th[is] emergency," the Court found, "it was necessary to enter the premises without awaiting the search warrant." Id. Thus, the Fourth Amendment was not violated.

The similar, and undisputed, material facts of this case demonstrate that

probable cause and exigent circumstances existed. First, the Defendants had probable cause to believe Shanks was storing contraband in Verelli's apartment. Shanks spent two to three nights per week at the apartment with Verelli. During the three separate occasions that Shanks sold drugs to undercover Detective Mecionis, he repeatedly referred to Verelli's apartment as his own. (Mecionis Aff. ¶ 2.) The three drug sales were within close proximity of the GHA complex. Just prior to the third sale on January 25, 2001, Shanks told the detective that he had to go to his apartment "to pick it up." He then sold drugs to Detective Mecionis immediately after he quickly entered and exited Verelli's apartment. The Court finds that probable cause existed to search Verelli's apartment.

      Second, the officers reasonably concluded that the drugs would be destroyed or removed if they waited to obtain a search warrant. The officers knew that Verelli lived in the apartment. When it became apparent that he was about to be arrested, Shanks ran into the GHA complex, towards Verelli's apartment, screaming Verelli's name "at the top of his lungs." The only reason Shanks did not actually reach Verelli's apartment is because Detective Martino was able to apprehend him first. The officers had reason to believe that Verelli knew of Shanks's drug distribution activities, giving further legitimacy to their fear that she

might remove or destroy narcotics that might be in the apartment.[5]  Though it does not appear that the officers knew whether Verelli heard Shanks's screams, the agents in Rubin also did not know whether someone at the gas station had in fact alerted the defendant's brother to destroy the hashish at the place of the search. Nonetheless, the Third Circuit found that the agents had a reasonable belief, based on the defendant's actions, that this could be so.  See Rubin, 474 F.2d at 269. Following Rubin, the Court finds here that the officers could reasonably have believed that Shanks's actions were designed to signal Verelli to destroy or remove drugs from the apartment.  A knock on Verelli's door by the officers revealed that Verelli was in fact home.  Accordingly, exigent circumstances justifying a warrantless search existed.

---

[5] On November 20, 2000, Verelli called Detective Mecionis and left her a voice mail asking Mecionis to call her back.  Upon receiving the message, Mecionis called Shanks to find out why Verelli had called.  Shanks told Mecionis that he believed Verelli was just checking his telephone bill, and that Mecionis should call Verelli back and tell her that they were only doing "business" and that Verelli would understand what doing "business" meant.  (Mecionis Aff. ¶¶ 4, 7.) Although Verelli denies knowing that Shanks was selling drugs, and points out that she denied knowing what doing "business" meant in a March 28, 2001 phone conversation she had with Mecionis (Plts.' Br. in Opp. to Mot. Summ J. ¶ 11.), this conversation came after the events of January 25, 2001, which are at issue here. Verelli does not deny that Shanks informed Mecionis prior to the search that Verelli knew that he was engaged in the business of selling illegal drugs.  Thus, it is undisputed that the officers were operating under this reasonable assumption when they decided that exigent circumstances existed necessitating an immediate search of Verelli's apartment.

This is not a case where "the police impermissibly created the very exigency which they claim permitted the warrantless search," see Coles, 437 F.3d at 362, as Verelli suggests. In Coles, the police had probable cause to believe that several persons possessing illegal drugs were located inside a hotel room. Id. at 370. In an attempt to gain entry, the police first posed as room service and maintenance. When that failed, the police then knocked and announced their presence at the hotel room door, causing the men inside to start destroying the drugs. Id. at 363-64. Hearing this activity, the police entered and searched the room, found contraband, and arrested the men inside. Id. at 364. However, because the defendants were not aware that the police were monitoring their activities inside the hotel room prior to the officers' subterfuge and knock and announce, the Court found that the risk that the drugs would be destroyed was of the officers' own making. Id. at 370-71. Thus, the officers' warrantless search was unjustified. Id. at 371. Here, the risk that the drugs the officers reasonably believed were in Verelli's apartment would be destroyed arose from Shanks's decision to evade arrest, and dash towards Verelli's apartment screaming her name. The officers investigative tactics were reasonable, and there is no evidence demonstrating that they impermissibly manufactured the exigency. See id.

Accordingly, the officers "had reasonable grounds to conclude that in light

of the emergency, it was necessary to enter the premises without awaiting the search warrant," id., and as such, the Fourth Amendment was not violated.

### ii.     Consent

Because exigent circumstances existed, the Court need not consider at length Defendants' argument that their warrantless search was justified in the alternative by Verelli's consent.  See Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973) (holding that consent, if voluntarily granted, provides an exception to the warrant requirement).  The Court notes however that Defendants' assertions that Verelli voluntarily signed the consent to search form overlooks the fact that the officers entered Verelli's home, without permission, *before* they asked if they could search.[6]  By the time Verelli consented to the search, voluntarily or not, the officers had been inside her home for at least 45 minutes.  "[T]he Fourth Amendment draws a firm line at the entrance to the house."  Kyllo v. United States, 533 U.S. 27, 40 (2001).  Entering a home without a search warrant in the absence of exigent circumstances or consent, constitutes an unreasonable search in

---

[6] The affidavit of BCPO officer Alan Lustmann, Jr., supports Verelli's testimony that the officers entered her apartment before obtaining consent.  (See Affidavit of Alan Lustmann, Jr. ¶ 8 ("I was present at the time the Task Force members entered the apartment of Stacey Verelli and asked her if a search of the premises could be done.").

violation of the Fourth Amendment, see, e.g., Vale, 399 U.S. at 35-36, even if merely to secure the premises in order to prevent the destruction of evidence while a search warrant is obtained, see Segura v. United States, 468 U.S. 796, 810 (1984).[7]  In this case, however, as the Court explained above, exigent circumstances existed, and consequently, the officers were entitled to enter and search the apartment without Verelli's consent.

### III.  Conclusion

For the foregoing reasons, Defendants' motions for summary judgment will be granted.

/s/ John C. Lifland, U.S.D.J.

December 6, 2006

---

[7] As the Segura Court explained, such entry does not constitute an unreasonable *seizure* of the home and its contents, an inquiry unrelated to the question of whether an unreasonable *search*, like that in Vale v. Louisiana, has been committed.  468 U.S. at 810.